**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MELANIE ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-01401-JMS-TAB |
| | ) | |
| UTC LABORATORIES, L.L.C., d/b/a RENAISSANCE RX | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

# DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,


**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.**

ERIN E. PELLETERI (LSBA #30666)
SARAH K. CASEY (LSBA #32385)
201 St. Charles Avenue, Suite 3600
New Orleans, LA 70170
Telephone: 504-566-5200
Fax: 504-636-4000

AND

**FROST BROWN TODD LLC**

JENAI M. BRACKETT (#30025-49)
201 N. Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN 46244-0961
Telephone: 317-237-3800
Fax: 317-237-3900

**ATTORNEYS FOR DEFENDANT, UTC LABORATORIES, L.L.C. d/b/a RENAISSANCE RX**

## TABLE OF CONTENTS


| | Page |
|---|---|
| Introduction | 1 |
| I. Background | 2 |
| II. Facts and Allegations | 3 |
| A. Ms. Adams' History with Renaissance RX | 3 |
| B. Interactions Between Ms. Adams and Mr. Terry | 4 |
| 1. The Initial Meeting on September 18 | 5 |
| 2. The Second Meeting on September 19 | 6 |
| 3. The Third Meeting on October 16 | 6 |
| 4. The Final Meeting in Late October | 7 |
| C. Ms. Adams' Termination | 9 |
| D. The Advent of Ms. Adams' Sex and Gender Claims | 11 |
| III. Ms. Adams' Claims Fail as a Matter of Law | 14 |
| A. Ms. Adams Fails to Establish a Prima Facie Case of Discrimination on the Basis of Sex or Age | 14 |
| 1. Ms. Adams Was Not Meeting Renaissance RX's Legitimate Expectations. | 16 |
| 2. No Similarly-Situated Employees Exist. | 17 |
| B. Even if Ms. Adams Could Establish a Prima Facie Case, Renaissance RX Terminated Ms. Adams for Legitimate, Non-Discriminatory Reasons. | 18 |
| IV. Ms. Adams Cannot Establish a *Prima Facie* Case for Hostile Work Environment under Title VII | 19 |
| A. Ms. Adams Cannot Show That Any Alleged Harassment Was Based on Sex. | 20 |

B. The Alleged Harassment Was Not Severe or Pervasive and There is No Evidence That It Interfered with Ms. Adams' Work. ......... 22

V. Ms. Adams Cannot Establish a *Prima Facie* Case for Hostile Work Environment under the ADEA. .................................................... 25

VI. Ms. Adams Cannot Succeed on her Retaliatory Discharge Claim. .......................... 26

VII. Conclusion ........................................................................................................ 27

## INTRODUCTION

Melanie Adams cannot deny that she never complained about her supervisor, Douglas Terry, until the day that he terminated her for poor performance. Renaissance RX and Ms. Adams both fully agree that Mr. Terry found her clinical knowledge lacking and that such knowledge was one of her primary job responsibilities. This agreement compels the legal conclusion via summary judgment that Ms. Adams was terminated for legitimate non-discriminatory reasons.

On the day she was terminated, Melanie Adams wrote a lengthy and detailed complaint about her supervisor, Douglas Terry. In that letter, Ms. Adams described every single interaction she had with him, and how he repeatedly critiqued her lack of clinical knowledge and poor performance. Despite the length and detailed nature of her complaint, there was absolutely no hint that Mr. Terry made any of the sexual or age-related comments that she now claims he did, or that Mr. Terry – or anyone at Renaissance RX – treated her any differently than the other sales representatives. In fact, despite her admitted work performance issues, Ms. Adams claimed to be shocked when Mr. Terry terminated her. She expressed that shock in an email to Human Resources directly following her termination; that email also contains no hint of the claims that would later surface. Ms. Adams' letter and email conclusively foreclose the revisionist history that Ms. Adams has tried to create regarding her time at Renaissance RX.

The reality is that Ms. Adams was in over her head as a sales representative for Renaissance RX because she lacked the necessary medical sales background and was unable or unwilling to take the necessary steps to improve her performance. Ms. Adams' sales numbers were not meeting expectations, she was not conversant in the technology of pharmacogenetics, and resisted efforts by Mr. Terry to improve. Notwithstanding her allegations, Ms. Adams

admits that she has no evidence of any person who was in a similar position with similar performance issues who was not fired. At best, Ms. Adams has only her subjective belief that she should have been given more time to increase her sales. That is not sufficient for her to maintain her claims.

## I. **Background**

Renaissance RX is a clinical laboratory specializing in advanced toxicology and DNA/molecular testing. Renaissance RX's services utilize cutting-edge technology, and it required that its sales force be conversant in all aspects of the technology and the services offered by Renaissance RX to effectively market them to physicians. Among other things, sales representatives were expected to be conversant regarding: (1) statistics specific to adverse drug reactions that may have been prevented with personalized medicine, (2) the cytochrome P450 genes, encoding enzymes that control the metabolism of more than seventy percent of prescription drugs, (3) the most commonly prescribed drugs by specialty and the gene(s) associated with those drugs, (4) reading and understanding the results of both the toxicology and pharmacogenetic testing, including the types of phenotypes, (5) qualitative versus quantitative drug screening and the confirmation testing via LC-MS/MS offered by Renaissance RX, and (6) the ways in which doctors can use pharmacogenomics and toxicology testing to help them treat their patients, particularly those with treatment resistant depression, pain management issues, and anti-platelet activation therapy. It was never enough for a sales representative to simply leave behind a brochure; the representative needed to know, and be able to answer questions regarding, the services being offered because, particularly in the instance of pharmacogenomic testing, physicians often required a fair amount of education due to the newness of the technology and sales representatives were sent into the field for the purpose of educating them.

## II. Facts and Allegations

### *A. Ms. Adams' History with Renaissance RX*

Ms. Adams was initially engaged as an independent contractor to sell Renaissance RX services in January 2014 by Capella Medical Group, a Renaissance RX independent contractor distributor based out of Georgia.[1] Ms. Adams did not have any pharmaceutical sales experience or experience selling services related to DNA – in fact, her last sales job had been nearly twenty years prior to starting work with Renaissance RX.[2]

For nearly two decades, Ms. Adams had worked as a substitute teacher in her children's schools.[3] She had begun working part-time in marketing in the health care field, and apparently needed to find a full-time position due to her family's financial straits.[4] Based on a family connection, she was engaged by Capella to sell Renaissance RX in Indiana.[5] By her own description, Ms. Adams received limited online training in Renaissance RX's products and services and was sent into the field without any real supervision or oversight.[6]

When Renaissance RX converted to a W-2 sales model in July 2014, Ms. Adams opted to enter into an at-will employment agreement directly with Renaissance RX.[7] Consistent with her change in classification, Ms. Adams' compensation changed from straight commissions to a

---

[1] Deposition of Melanie Adams, taken 9/14/16 ("Adams Depo."), pp. 20:21–21:2, excerpts attached as Exhibit "1"; Declaration of Bridget Boe, dated 11/30/16 ("Boe Decl."), ¶ 6, attached as Exhibit "2."

[2] Ex. "1," Adams Depo, p. 20:2-10; see also, Resume of Melanie K. Adams ("Adams Resume") attached as Exhibit "3.".

[3] Ex. "1," Adams Depo., p. 16:15-18; Ex. "3," Adams Resume.

[4] Ex. "1," Adams Depo., p. 22:16-19.

[5] Ex. "1," Adams Depo., pp. 21:6-10 and 22:16-19.

[6] 10/30/14 Letter from Ms. Adams to Mr. McAndrews, Bates RENRX 000094-96, attached as Exhibit "4." ("I have not had any training or any one working with me in the field.")

[7] Ex. "1," Adams Depo., p. 63:11-14.

$36,000 base salary, a five percent commission rate, and a $600 monthly car allowance.[8] At the time of her hire, Ms. Adams was fifty-three years old.[9] Her job title was Territory Manager, and her job responsibilities, not surprisingly, included having "the ability to discuss the various testing services thoroughly from a clinical perspective to potential clients."[10] Ms. Adams received Renaissance RX's Employee Handbook, which contained anti-harassment, anti-discrimination, and anti-retaliation policies.[11] Among other things, the Handbook obligates employees to immediately report any words or actions constituting harassment.[12] Ms. Adams signed an acknowledgement that she received and read the Handbook on July 23, 2014.[13]

*B. Interactions Between Ms. Adams and Mr. Terry*

As a Renaissance RX employee, Ms. Adams was assigned to two supervisors – District Manager, Douglas Terry, and General Manager, Dr. Chris Graf.[14] At that time, Mr. Terry supervised a total of five sales representatives - Ms. Adams (female, age 53), Michelle Miller (female, age 45), and Tony Dal Santo (male, age 38) in Indiana, and Wyatt Doncses (male, age 26) and Urata Koshi (female, age 37) in North Carolina.[15] While he lived in North Carolina, Mr. Terry explained that he made it a priority to have regular contact with all of his sales representatives.[16] As a twenty-year veteran of the health care industry, Mr. Terry knew the

---

[8] 6/19/14 Offer Letter attached as Exhibit "5."

[9] Ex. "1," Adams Depo, p. 8:21-22.

[10] Territory Manager Job Description attached as Exhibit "6." Although Ms. Adams did not recall receiving a copy of her Job Description, she agreed that the Responsibilities section of the Description was accurate. Ex. "1," Adams Depo., pp. 30:13-31:1.

[11] Renaissance RX Employee Handbook, p. 18, Bates RENRX 000002, attached as Exhibit "7."

[12] *Id.*

[13] Employee Handbook Acknowledgement, Bates RENRX 000080, attached as Exhibit "8."

[14] Personnel Action Form, Bates RENRX 000081, attached as Exhibit "9"; Deposition of Douglas Wayne Terry, taken 9/30/16 ("Terry Depo."), p. 56:9-16, excerpts attached as Exhibit "10."

[15] Ex. "2," Boe Decl., ¶ 7.

[16] Ex. "10," Terry Depo., p. 228:3-19.

importance of knowing his sales representatives and evaluating their strengths.[17] In addition to regular texts, emails, and phone meetings, Mr. Terry traveled to Indiana regularly.[18]

Renaissance RX is in a highly-regulated industry, and its sales representatives were absolutely prohibited from marketing or discussing the research aspect of the business with physicians; they were to sell the technology and clinical aspects only.[19] Because it was a pioneering product, the sales representatives are expected to be the first-line clinical resource for the physicians.[20] Thus, it was imperative for Mr. Terry that his sales representatives be well-versed in the clinical aspects of the technology so that they could respond to physicians in the field.[21]

1. <u>The Initial Meeting on September 18</u>

To evaluate his three Indiana sales representatives, Mr. Terry set up in-person meetings with each of them within a couple of weeks of being assigned the territory.[22] Mr. Terry and Ms. Adams met for the first time at Paradise Bakery for a couple of hours on September 18, 2014.[23] Ms. Adams made no complaints regarding this meeting with Mr. Terry until the day she was terminated.[24]

---

[17] Ex. "10," Terry Depo., p. 8:9-23.

[18] Ex. "10," Terry Depo., pp. 91:12-22 and 228:3-16.

[19] Ex. "10," Terry Depo., p. 197:1-13.

[20] Ex. "10," Terry Depo., p. 177:16-20.

[21] Ex. "10," Terry Depo., p. 177:2-20.

[22] Ex. "10," Terry Depo., p. 80:1-10.

[23] Ex. "1," Adams Depo., pp. 107:21-108:13.

[24] Ex. "1," Adams Depo., p. 109:16-24.

2. The Second Meeting on September 19

The next day, Mr. Terry met with all three of his Indiana sales representatives – Ms. Adams, Ms. Miller, and Mr. Dal Santo.[25] At the time of the meeting, Ms. Adams had been selling Renaissance RX products and services for nine months - the longest of the three, Mr. Dal Santo had been selling for five months, and Ms. Miller had been selling for just one month.[26]

The meeting lasted three to four hours, and involved an overview of the resources available to the sales representatives.[27] Again, Ms. Adams had no complaints about this meeting with Mr. Terry until the day she was terminated.[28]

3. The Third Meeting on October 16

Mr. Terry planned a four-day trip to Indiana in mid-October and provided notice to all the representatives so that they could set up sales calls and he could observe them in the field.[29] Out of the three representatives, only Ms. Adams failed to set up any sales meetings.[30] Instead, Ms. Adams called Mr. Terry the Friday afternoon before his trip and asked to meet with him.[31] As an accommodation, Mr. Terry agreed to rearrange his schedule to ensure that he could have another in-person visit with Ms. Adams and discuss her prospects and sales goals.[32] Ms. Adams' focus for the meeting was on the fact that there were certain accounts for which she had not yet

---

[25] Ex. "10," Terry Depo., p. 81:6-18.

[26] Ex. "2," Boe Decl., ¶ 7; Ex. "10," Terry Depo., p. 142:3-12.

[27] Ex. "10," Terry Depo, pp. 81:11 - 82:1.

[28] Ex. "1," Adams Depo., p. 211:5-15.

[29] Ex. "10," Terry Depo., p. 93:10-24.

[30] Ex. "10," Terry Depo., pp. 93:6- 95:1.

[31] Ex. "10," Terry Depo., p. 94:13-17.

[32] Ex. "10," Terry Depo., pp. 94:18-95:1.

received commissions.[33] After Mr. Terry addressed her concerns, he then took the opportunity to assess Ms. Adams' progress in terms of clinical knowledge.

Despite the fact that Ms. Adams had been selling Renaissance RX's products and services for months, Mr. Terry was apparently the first person to ever test Ms. Adams' clinical knowledge.[34] He testified that, in each of their interactions, he found her to be unfamiliar with the products and counseled her about the need to improve.[35] It was his practice to assess all of his representatives – and his other Indiana representatives, Ms. Miller and Mr. Dal Santo, demonstrated significantly more clinical knowledge than Ms. Adams even though they each had been with the company a shorter time.[36] As with her first two meetings with Mr. Terry, Ms. Adams made no complaint to Renaissance RX about this meeting until the day she was terminated.[37]

4. <u>The Final Meeting in Late October</u>

Due to his concerns about her performance, Mr. Terry made a specific trip to Indianapolis in late October for the purpose of accompanying Ms. Adams on her sales calls.[38] This was his first – and ultimately the last – time to observe her in the field. After Ms. Adams picked Mr. Terry up from the airport in Indianapolis on the morning of October 28, 2014, he learned that Ms. Adams only had one confirmed sales call over the three-day period and that was in Evansville, approximately four-and-a-half hours away.[39] So, they drove to multiple doctors'

---

[33] Ex. "10," Terry Depo., pp. 95:19-96:2.

[34] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[35] Ex. "10," Terry Depo, pp. 99:3-101:25 and 9/25/14 E-mail from Mr. Terry to Ms. Adams, Bates RENRX 000661, attached as Exhibit "11."

[36] Ex. "10," Terry Depo., pp. 102:1-104:9.

[37] Ex. "1," Adams Depo., p. 114:11-17.

[38] Ex. "10," Terry Depo., p. 174:4-11.

[39] Ex. "10," Terry Depo., pp. 181:14-182:5.

offices on cold calls, and Mr. Terry took the opportunity to check Ms. Adams' progress, most notably her clinical knowledge.[40] He observed no improvement in that regard.[41] It appeared to Mr. Terry that Ms. Adams was simply not interested in improving her performance.[42]

During one of their cold calls, Mr. Terry and Ms. Adams saw two female pharmaceutical representatives waiting in their car in the parking lot of a physician office, and Mr. Terry told Ms. Adams she should speak to them about the area and possible doctor prospects.[43] Ms. Adams made no complaint to anyone about this interaction during her time at Renaissance RX.

Later, Ms. Adams and Mr. Terry ate dinner at Texas Roadhouse on the night of October 28, 2014, and Mr. Terry spoke to the waitress about a potential opening in administration with Renaissance RX.[44] Ms. Adams again made no complaint to Mr. Terry – or anyone else – about anything that transpired during that dinner.

The morning of October 29 Ms. Adams and Mr. Terry made their sole scheduled visit to a doctors' office in Evansville.[45] While not planned, Mr. Terry ended up giving the sales presentation to the doctor because Ms. Adams could not.[46] After leaving the doctors' office, Mr. Terry and Ms. Adams had a heated exchange and Mr. Terry called an end to the trip, asking Ms. Adams to drop him off at the airport so he could rent a car.[47]

---

[40] Ex. "1," Adams Depo., p. 174:2-21.

[41] Ex. "10," Terry Depo., p. 174:12-15.

[42] Ex. "10," Terry Depo., p. 175:7-8.

[43] Ex. "10," Terry Depo., pp. 200:11-201:13.

[44] Ex. "10," Terry Depo., pp. 182:15-183:17.

[45] Ex. "10," Terry Depo., p. 191:13-25.

[46] Ex. "10," Terry Depo., pp. 178:6-179:2.

[47] Ex. "10," Terry Depo., p. 191:18-25; Ex. "1," Adams Depo., p. 143:8-12. Although Ms. Adams first claimed that it was her decision to part ways with Mr. Terry, she has now testified that it was indeed at Mr. Terry's insistence that the trip ended early. See Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

### *C. Ms. Adams' Termination*

Mr. Terry had consulted previously with both his General Manager, Dr. Chris Graf, and his Area Vice President, Ryan Dienst, regarding his concerns with Ms. Adams' job performance and lack of clinical knowledge.[48] After observing her performance in the field and having to cut short his visit, Mr. Terry reached out to Dr. Graf that evening regarding what transpired and the decision was made then to terminate Ms. Adams.[49]

While Mr. Terry felt Ms. Adams' behavior was unacceptable, Ms. Adams was apparently unfazed and emailed him the morning following their parting indicating her upcoming plans to meet with Dr. Graf and wishing him a good trip back to North Carolina.[50] Approximately fifteen minutes later, Mr. Terry sent an e-mail to Ms. Adams asking her to call him.[51] Ms. Adams avoided his call and instead spent several hours drafting a complaint regarding Mr. Terry to Renaissance RX's Human Resources Department and its General Counsel.[52] This letter – the first record of any complaint by Ms. Adams regarding Mr. Terry – was twelve paragraphs and three pages long.[53] Ms. Adams explained in her deposition that the letter was intended to detail all of the ways in which she believed she had been mistreated by Mr. Terry[54] – and the letter contains multiple references to Mr. Terry's focus on her inadequate performance, namely his

[48] Ex. "10," Terry Depo., pp. 134:23-138:14.

[49] Ex. "10," Terry Depo., pp. 203:5-205:13.

[50] 10/30/14 E-mail from Ms. Adams to Mr. Terry, Bates RENRX 001282, attached as Exhibit "12."

[51] 10/30/14 E-mail from Mr. Terry to Ms. Adams, Bates RENRX 001082, attached as Exhibit "13."

[52] Ex. "4," 10/30/14 E-mail from Ms. Adams to Mr. McAndrews, Bates RENRX 000093, and attached Letter, Bates RENRX 000094-96.

[53] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[54] Ex. "1," Adams Depo., p. 149: 2-13.

instructions that she needed to "increase [her] numbers," his "quizzing," and his "harassment" regarding her "product knowledge."[55]

In her letter, Ms. Adams describes her in-person interactions with Mr. Terry, complete with dates and quotes.[56] Despite its length and detail, it is entirely devoid of any suggestion that Mr. Terry's treatment of Ms. Adams was any different than his treatment of his other representatives.[57] Ms. Adams' letter also lacks any and all reference to the multiple and varied comments about young, beautiful women and other age-related comments she would later allege had been made by Mr. Terry.

Only after sending the e-mail that evening did Ms. Adams finally call Mr. Terry – a brief conversation that she secretly recorded in which Mr. Terry terminated her for performance reasons.[58] After her termination, Ms. Adams sent another e-mail to Human Resources and the General Counsel, informing them that she had been fired for "no concrete reason,"[59] despite the lengthy letter that she had just sent regarding Mr. Terry's criticisms of her performance. Again, Ms. Adams made no mention of any inappropriate or sexual or age-related comments or conduct by Mr. Terry towards her.[60]

---

[55] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[56] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[57] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[58] Transcription of Recorded Phone Call, attached as Exhibit "14."

[59] 10/30/14 E-mail from Ms. Adams to Mr. McAndrews and Ms. Sheely, Bates RENRX 000097, attached as Exhibit "15."

> I called Doug Terry this evening to let him know my plan of action for work tomorrow and he fired me over the phone. I asked him why and he said, "because its [sic] not going to work out". I asked him what he meant by that and he just said, "its [sic] not going to work out". He fires me over the phone and for no concrete reason. I am shocked by this total lack of professionalism and the experiences I have incurred. I feel like this is retaliation toward me. I think it is most important for me to have a discussion with each of you tomorrow.

[60] *Id*.

### *D. The Advent of Ms. Adams' Sex and Gender Claims*

Approximately two months after her termination, Ms. Adams filed a Charge with the Equal Employment Opportunity Commission ("EEOC"). For the first time, Ms. Adams claimed that she suffered harassment and discrimination due to her age and sex. The EEOC issued a Dismissal and Notice of Rights on June 5, 2015,[61] and Ms. Adams filed suit in this Court on September 3, 2015 for: (1) violation of Title VII, (2) violation of the Age Discrimination in Employment Act ("ADEA"), and (3) retaliatory discharge under Indiana state law. [62]

Although Ms. Adams was terminated by Renaissance RX because of admitted performance issues and inability to master the clinical knowledge necessary for a sales representative, in her Complaint, she alleged that "similarly-situated, young attractive female employees who enjoyed less success than Adams" were treated more favorably than she was.[63] Ms. Adams also alleged that Mr. Terry created a hostile work environment through his "constant expression of his preference for young, attractive females,"[64] and that he terminated her because she was over forty and also for voicing her opposition to alleged violations of Medicare regulations.[65]

Ms. Adams makes the following allegations regarding her claims:

---

[61] 6/5/15 Notice of Rights Letter attached as Exhibit "16."

[62] Complaint for Damages [R. Doc. No. 1]. Ms. Adams initially named as defendants Renaissance RX, TPG Growth, LLC, Dr. Tarun Jolly, Barry Griffith, Patrick Ridgeway, and Mr. Terry Ms. Adams subsequently dismissed all of her claims against TPG Growth, LLC and against all individual defendants, as well as her claim under Indiana's Anti-Kickback Statute. Stipulation of Dismissal

[63] Complaint for Damages, ¶ 40, [R. Doc. No. 1].

[64] Complaint for Damages, ¶ 18, [R. Doc. No. 1].

[65] Complaint for Damages, ¶ 49, [R. Doc. No. 1].

*Age Discrimination:*

- "[S]imilarly-situated young attractive female employees who enjoyed less success than Adams were allowed better terms, conditions, and privileges of employment."[66]

- "Similarly-situated, substantially younger individuals were allowed better terms, conditions, and privileges in employment."[67]

*Sex Discrimination:*

- Renaissance and Terry selected "Renaissance RX's employees based upon their meeting certain sexual standards, which are young, attractive, and female."[68]

*Hostile Work Environment:*

- Mr. Terry "informed Adams that his young sales representatives were doing extremely well, but she was not."[69]

- Mr. Terry stated that he loved working with young people because they will do anything he asks them.[70]

- Mr. Terry stated that he missed working with cute, young hot girls.[71]

- Mr. Terry forced her to ask for the business cards of two young and good-looking women.[72]

- Mr. Terry "[a]ggressively recruited" a young, blonde, and attractive waitress to send her resume to him.[73]

- Mr. Terry yelled at and belittled her when she did not know the answers to his clinical questions.[74]

---

[66] Complaint for Damages, ¶ 40, [R. Doc. No 1].

[67] Complaint for Damages, ¶ 27, [R. Doc. No 1].

[68] Complaint for Damages, ¶ 38 [R. Doc. No 1].

[69] Complaint for Damages, ¶ 17(a), [R. Doc. No. 1].

[70] Complaint for Damages, ¶ 17(f), [R. Doc. No. 1].

[71] Complaint for Damages, ¶ 17(d), [R. Doc. No. 1].

[72] Id. at ¶ 17(b).

[73] Id. at ¶ 17(h).

[74] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews

- Mr. Terry warned Ms. Adams and the other sales representatives not to put inappropriate pictures on their work computers.[75]

*Retaliatory Discharge:*

- Mr. Terry made statements to Adams that made her believe that she did not go along with his plan to circumvent Medicare regulations, he would look down on her and give her negative reviews.[76]

At the heart of Ms. Adams' claims is her allegation that she was treated less favorably than other "similarly-situated young attractive female employees who enjoyed less success." Although she makes this allegation, she has not explained how she was treated less favorably or identified any person - much less a "similarly-situated young attractive female employee" who was treated more favorably. In fact, Ms. Adams admitted in her deposition that she had no actual knowledge of how the other representatives were treated by Mr. Terry.[77]

And, the claimed "harassment" by Mr. Terry – which she never reported or complained about to Renaissance RX – was a handful of comments allegedly by Mr. Terry regarding how much he enjoyed working with young, attractive females and his request that a waitress send him her resume. Even assuming that these events occurred (and there is no evidence to suggest that they did), this is simply not the type of objectionable conduct actionable under the law. By her own admission, Ms. Adams was not performing per the expectations of her manager, and, while she may have felt that she was fired "for no good reason," there is nothing illegal about it.

---

[75] Complaint at ¶ 18; Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[76] Id. at ¶ 21.

[77] Ex. "1," Adams Depo, p. 179:3-185:5.

## III. Ms. Adams' Claims Fail as a Matter of Law

It is well-settled that a non-moving party who bears the burden of proof at trial may *not* merely rest on its allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[78] Conversely, "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56, Advisory Committee Notes, 2010 Amendment, Subdivision (c)(1)(B). Stated another way, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). If Renaissance RX meets this burden, Ms. Adams cannot rest on conclusory pleadings, but must "present sufficient evidence to show the existence of each element of [her] case on which [she] will bear the burden at trial." *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000). If the evidence supporting Ms. Adams' claims is insufficient for a reasonable jury to return a verdict in her favor, summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### *A. Ms. Adams Fails to Establish a* Prima Facie *Case of Discrimination on the Basis of Sex or Age.*

Ms. Adams alleges that Renaissance RX unlawfully discriminated against her on the basis of sex and age because "similarly-situated young attractive female employees who enjoyed less success than Adams were allowed better terms, conditions, and privileges of employment."[79]

[78] "In our view, the plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (emphasis added).

[79] Complaint for Damages, ¶ 40, [R. Doc. No 1].

A plaintiff may prove discrimination using either the direct method, "by proffering direct or circumstantial evidence that discrimination motivated the adverse employment decision," or the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cox v. Coca-Cola*, No. 1:14-00936, 2016 WL 3194807, at *3 (S.D. Ind. June 9, 2016).

Ms. Adams has not presented any direct evidence of discrimination. She attempts to present circumstantial evidence in the form of alleged comments by Mr. Terry. However, none of the alleged comments by Mr. Terry are even remotely related to the decision to terminate Ms. Adams. Ms. Adams alleges that in the course of conversation, Mr. Terry made remarks that he likes working with young sales representatives and that he misses working with the young beautiful women in the pharmaceutical industry.[80] None of these remarks are related to the employment action taken against Ms. Adams on October 30, 2014. "Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993) (quoting *McCarthy v. Kemper Life Ins. Companies,* 924 F.2d 683, 686-87 (7th Cir. 1991)). In *Monaco*, the plaintiff alleged that his supervisor made age-based comments to him over the course of a year, including, "you're getting kind of old, why don't you quit?" *Id.* at 659. When he was passed over for a promotion and denied additional time off, the plaintiff quit, claiming constructive discharge on the basis of age discrimination. *Id.* The Seventh Circuit agreed with the trial court's determination that a sufficient causal connection did not exist between the alleged remarks and the actions taken by the employer. *Id.* at 660. Similarly, here, the remarks alleged by Ms. Adams are not causally connected to her termination. Therefore, they are insufficient to prove discrimination.

---

[80] Complaint for Damages, ¶ 17(d) and (f), [R. Doc. No 1].

Ms. Adams likewise fails to prove discrimination under the indirect method. To prove her disparate treatment claim, Ms. Adams has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting Renaissance RX's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated younger or male employees were treated more favorably. *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). While she is a member of a protected class and was terminated, Ms. Adams cannot establish the second or fourth prong.

1. Ms. Adams Was Not Meeting Renaissance RX's Legitimate Expectations.

A plaintiff's inability to show that he is meeting the employer's legitimate employment expectations "is fatal to his reliance on the indirect method." *Sklyarsky v. Means-Knaus Partners, LP*, 777 F.3d 892, 897 (7th Cir. 2015) (citing *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104-05 (7th Cir. 2012)).

By her own admission, Ms. Adams' sale numbers were sub-par.[81] After eleven months as a sales representative, Ms. Adams ranked in the bottom half of sale representatives in her projected number of swabs for the month of October.[82] Every one of Mr. Terry's sales representatives ranked above her with the exception of Ms. Miller, who had only been with Renaissance RX for a month at the time.[83] At the time of her termination, two of Ms. Adams' three accounts were winding down, with no indication that she would be able to replace them with new accounts.[84]

---

[81] Ex. "1," Adams Depo, p. 102:2-7.

[82] October 2014 Sales Score Cards, attached as Exhibit "17."

[83] Ex. "10," Terry Depo., p. 145:11-15.

[84] Ex. "10," Terry Depo., p. 167:3-21.

Beyond Ms. Adams' lackluster sales performance, she had also demonstrated a lack of clinical knowledge with no indication that she was improving or had any interest in improving. Mr. Terry consistently communicated his expectation that his sales representatives be knowledgeable about the clinical aspects of Renaissance RX's business.[85] Ms. Adams' job description specifically encompassed "the ability to discuss the various testing services thoroughly from a clinical perspective to potential clients."[86] By her own admission, Ms. Adams was unfamiliar with the information in the training materials circulated to all the sales representatives and failed on multiple occasions to satisfactorily demonstrate to Mr. Terry that she had a reasonable command of the information.[87] She also apparently saw no issue with the fact that Mr. Terry was required to take over the one sales call where he accompanied her in the field.

Ms. Adams does not dispute that she was unable to answer Mr. Terry's clinical questions. Instead, she apparently found it unreasonable that her manager expected her to be familiar with the products and services that she was supposed to be selling.[88] Given the sophistication of Renaissance RX's business and Ms. Adams' tenure selling Renaissance RX's products and services, it was legitimate for Mr. Terry to expect that she be knowledgeable about its products and services. She was not.

2. No Similarly-Situated Employees Exist.

Even if Ms. Adams could establish that she was meeting Renaissance RX's expectations, she cannot establish that similarly situated male or younger employees were treated more

[85] Ex. "10," Terry Depo., p. 102:16-20.

[86] Ex. "6," Territory Manager Job Description.

[87] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[88] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

favorably. Ms. Adams candidly admitted in her deposition that she could not identify any employee who was treated more favorably than she was – in fact, she stated that she did not know how any other employees were treated.[89]

A "similarly situated" comparator must be someone, who is not in the protected class, and who is directly comparable in ***all material aspects***. *Cox*, 2016 WL 3194807, at *5 (emphasis added). Despite claiming in her Complaint that "similarly-situated younger attractive female employees" received more favorable treatment, Ms. Adams has not identified any such person. She has also not identified any person – not in a protected class – who was directly comparable to her in all material respects. Ms. Adams admitted that she did not speak with the other representatives and has no information regarding how Mr. Terry treated them or how they performed.[90]

As such, Ms. Adams has failed to establish a *prima facie* case for disparate treatment on the basis of sex or age using either the direct or indirect method, and her claims should be dismissed.

### *B. Even if Ms. Adams Could Establish a* Prima Facie *Case, Renaissance RX Terminated Ms. Adams for Legitimate, Non-Discriminatory Reasons.*

Even if Ms. Adams could establish a *prima facie* case of disparate treatment, the burden then shifts to Renaissance RX to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Farrell,* 421 F.3d at 613. Ms. Adams would then need to submit evidence that Renaissance RX's explanation is pretextual. *Id.* Renaissance RX terminated Ms. Adams' employment for the reasons set forth by Mr. Terry at his deposition: her sales numbers were

[89] Ex. "1," Adams Depo., pp. 180:21-181:5.

[90] Ex. "1," Adams Depo., pp. 184:25-185:5.

low, she was lacking in clinical knowledge, and she had demonstrated a poor attitude.[91] Any of these reasons alone would be cause for termination.

Ms. Adams cannot show that these reasons are pretext. To do so, she "must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.,* 328 F.3d 309, 323 (7th Cir. 2003), *as amended* (May 22, 2003). She must provide evidence that all the reasons for her termination are "factually baseless" *Testerman v. EDS Technical Prods. Corp.,* 98 F.3d 297, 303 (7th Cir. 1996) (citation omitted), and that Ms. Adams would not have been let go but for her age or sex. *Balderston,* 328 F.3d at 323. "The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." *Id.* Ms. Adams cannot present evidence that Mr. Terry did not honestly believe what he has testified to be the reasons for Ms. Adams' termination. She has admitted that her numbers were lower than other sales representatives and acknowledges that she could not answer Mr. Terry's clinical questions.[92]

## IV. Ms. Adams Cannot Establish a *Prima Facie* Case for Hostile Work Environment under Title VII

To establish a *prima facie* case for hostile work environment under Title VII based on sexual harassment, Ms. Adams must show that:

> (1) she was subject to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability.

[91] Ex. "10," Terry Depo., pp. 164:2-165:24.

[92] Ex. "1," Adams Depo., p. 102:2-7.

*Benders v. Bellows & Bellows*, 515 F.3d 757, 768 (7th Cir. 2008). The United States Supreme Court has concluded that a hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002). Ms. Adams' allegations and testimony fail to establish a *prima facie* case for hostile work environment.

Unwelcome sexual harassment can take the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature. *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998). Ms. Adams has alleged that Mr. Terry made the following three comments that are of an allegedly sexual nature: (1) he instructed the sales representatives not to put naked pictures on their work computers;[93] (2) he said that he missed the pharmaceutical industry because of the young, good-looking women;[94] and (3) he asked the waitress for her resume.[95]

### *A. Ms. Adams Cannot Show That Any <u>Alleged Harassment Was Based on Sex.</u>*

The second element of a hostile work environment claim requires Ms. Adams to show that, but for her sex, she would not have been the subject of the harassment. *Pasqua v. Metropolitan Life Ins. Co.,* 101 F.3d 514, 517 (7th Cir. 1996). Ms. Adams cannot make this showing. Ms. Adams indicated that Mr. Terry made the computer comment to the other sales representatives, including Mr. Dal Santo.[96] Nothing about the other two alleged comments indicates that Mr. Terry made them because Ms. Adams is a woman. Indeed, the alleged

---

[93] Complaint for Damages [R. Doc. No. 1], at ¶ 18.

[94] Id. at ¶ 17(d).

[95] Id. at ¶ 17(h).

[96] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

comments had nothing to do with Ms. Adams at all. The United States Supreme Court has long held:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discriminat [ion]* ... because of ... sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Simply because Mr. Terry's alleged comments were arguably sexual in nature is not enough to establish that the alleged harassment was based on sex.

Ms. Adams has not shown that Mr. Terry acted or spoke the way she alleges he did because Ms. Adams is a woman. The alleged behavior of Mr. Terry about which Ms. Adams was the most upset and what prompted her to send a letter complaining about him to Human Resources had nothing to do with the above comments. In fact, the only comment mentioned in the letter is the one Mr. Terry allegedly made warning Ms. Adams and the other representatives not to put naked pictures on her work computer.[97] What was the most upsetting for Ms. Adams was Mr. Terry's allegedly demanding and demeaning nature. It was his alleged behavior on October 16 and his alleged behavior in the doctor's office on October 29 that she emphasizes the most. This alleged behavior had nothing to do with sex. Ms. Adams testified that Mr. Terry screamed at her in their meeting on October 16 and was angry because she was not familiar with the Power Point presentation.[98] She claims she left the meeting in tears.[99] Similarly, on October

[97] Ex. "4," 10/30/14 Letter from Ms. Adams to Mr. McAndrews.

[98] Ex. "1," Adams Depo., p. 113:3-24.

[99] Ex. "1," Adams Depo., p. 113:23-24.

29 in the doctors' office, Ms. Adams alleges that Mr. Terry upset her by screaming at her and asking her questions about her product knowledge.[100]

Non-sexual conduct may be actionable where there are no reports of similar behavior toward male co-workers. *Adan v. Solo Cup, Inc.*, No. 01 C 3966, 2002 WL 448996, at *5 (N.D. Ill. Mar. 21, 2002) (citing *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999)). Nowhere, however, in Ms. Adams' pleading or in her deposition testimony, is there any evidence that Mr. Terry's alleged actions were unique to Ms. Adams or because she was a woman. Indeed, Ms. Adams noted that Mr. Terry yelled at his male sales representatives,[101] and "was very bipolar"[102] and a "belligerent, mean, condescending person."[103] Even if Ms. Adams could establish that the actions she complains of were based on her sex, she cannot satisfy the third prong of the *prima facie* case.

*B. The Alleged Harassment Was Not Severe or Pervasive <u>and There is No Evidence That It Interfered with Ms. Adams' Work.</u>*

To satisfy the third prong, Ms. Adams must demonstrate that Mr. Terry's behavior was both objectively and subjectively offensive. *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 505 (7th Cir. 2004). Ms. Adams has not done either. As to subjective offensiveness, although Ms. Adams now claims to have been offended by Mr. Terry's comments, she was never so offended during her employment that she complained about any comment of a sexual nature allegedly made by Mr. Terry. As noted above, Ms. Adams testified that Mr. Terry made her cry on two occasions, but neither of these occasions involved comments of a sexual nature.

[100] Ex. "1," Adams Depo., p. 140-141.

[101] Ex. "1," Adams Depo., p. 135:9-16.

[102] Ex. "1," Adams Depo., p. 113:8.

[103] Ex. "1," Adams Depo., p. 207:19-20.

In *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007), the court found that the plaintiff's multiple complaints about the comments provided sufficient evidence of their subjective offensiveness. Here, when Ms. Adams did complain about Mr. Terry to Human Resources via her letter on October 30, it was not because she was offended by any sexual comments he had allegedly made.

Objective offensiveness is determined by an analysis of several factors. *Id.* Courts look at the frequency of the conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with work performance. *Id.* As noted above, Ms. Adams and Mr. Terry were physically together on only four occasions in the span of a month and a half. Otherwise, they communicated by phone or e-mail, and Ms. Adams has not alleged any harassment over phone or e-mail. Indeed, the e-mail messages and texts that have been produced in this case show nothing but benign, professional, and even friendly, communications between Mr. Terry and Ms. Adams.[104] Therefore, it cannot be said that the allegedly offensive conduct was frequent. "Relatively isolated instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

Nor could Mr. Terry's alleged conduct be characterized as "severe." In *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993), the Seventh Circuit found that the plaintiff's claim was not actionable because the alleged conduct - offender asked the plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her - was not severe. Mr. Terry's alleged conduct is far less offensive than the behavior found to be insufficiently severe in *Weiss*.

[104] See, for example, the record of text messages exchanged between Mr. Terry and Ms. Adams (Exhibit 18 to Terry Depo.), attached as Exhibit "18."

Similarly, in *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001), the offender referred to the plaintiff as "grandma," voiced his opinion that all intelligent women are unattractive, called each of the plaintiff's female colleagues "bitches," and told another woman she dressed "like a whore" and was hired for her looks. The court found the conduct not to be actionable, concluding that "the discrimination laws do not mandate admirable behavior from employers." *Id. See also, Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006) ("Not all offensive conduct violates federal law; Title VII is not a civility code." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir. 2000).

Ms. Adams has alleged that Mr. Terry made comments about putting pictures on a computer, indicated that he missed the young beautiful women that work in the pharmaceutical industry, and asked a waitress for her resume. None of these can remotely be considered physically threatening or humiliating. This alleged conduct falls far short of what could be considered "severe."

Lastly, Ms. Adams' testimony is devoid of the slightest inkling that Mr. Terry's alleged conduct interfered with her work performance. Ms. Adams alleges in her Complaint that she satisfactorily performed her job duties throughout her employment with Renaissance RX.[105] She alleges that the presentation to the doctor in Evansville on October 29, 2014, before which Mr. Terry allegedly screamed at her, went well, and she thought that they would get the account.[106] None of the factors for objective offensiveness fall in Ms. Adams' favor, and she cannot establish the third prong of the *prima facie* case. Because Ms. Adams cannot establish the

[105] Complaint for Damages [R. Doc. No. 1], ¶ 37.

[106] Ex. "1," Adams Depo., p. 142:1-10.

second or third prongs of the *prima facie* case for hostile work environment on the basis of sex, Renaissance RX is entitled to summary judgment dismissing this claim.

### V. Ms. Adams Cannot Establish a *Prima Facie* Case for Hostile Work Environment under the ADEA.

Ms. Adams' claim for hostile work environment on the basis of age fails for similar reasons. The Seventh Circuit has assumed without deciding that plaintiffs may bring a claim of a hostile work environment under the ADEA. *Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 603 (7th Cir. 2014). A hostile work environment claim on the basis of age is analyzed under the same factors as a sex claim. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001). "[T]he environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

As with her sex claim, Ms. Adams cannot establish that she was subjected to harassment on the basis of her age. Ms. Adams alleges the following conduct by Mr. Terry related to age: (1) he wanted to hire the young female pharmaceutical representatives;[107] (2) he said he loved the young sales representatives working for him because he could yell at them and they would do what he told them;[108] (3) he asked the young waitress for her resume;[109] and (4) he mentioned to Ms. Adams that she had been in the business a long time.[110] No evidence has been presented that Mr. Terry treated the younger sales representatives any differently than he treated Ms. Adams. In fact, Ms. Adams testified that Mr. Terry told her how he loves to yell at the younger

[107] Ex. "1," Adams Depo., pp. 131:6-132:16.

[108] Ex. "1," Adams Depo., p. 135:4-16.

[109] Ex. "1," Adams Depo., pp. 135:21-136:15.

[110] Ex. "1," Adams Depo., p. 184:6-11.

representatives.[111] Further, although Ms. Adams claims to have been offended by Mr. Terry's comments and behavior, she never complained about age harassment until after she was terminated.

## VI. **Ms. Adams Cannot Succeed on her Retaliatory Discharge Claim.**

Ms. Adams alleges a claim for retaliatory discharge under Indiana state law. Indiana is an at-will employment state and employees may be discharged without cause. *Frampton v. Cent. Indiana Gas Co.*, 260 Ind. 249, 253, 297 N.E.2d 425, 428 (1973). Indiana has recognized only two sets of circumstances in which an employee can bring a cause of action for retaliatory discharge in violation of public policy. The Indiana Supreme Court has long recognized that an employer cannot discharge an employee for exercising her statutorily guaranteed right to file a worker's compensation claim. *Id.* The state high court has also held that an employer can also be liable for "firing an employee for refusing to commit an illegal act for which he would be personally liable." *McClanahan v. Remington Freight Lines, Inc.,* 517 N.E.2d 390, 393 (Ind. 1988).

Considering the extremely narrow circumstances in which an employee can bring a claim for retaliatory discharge under Indiana law, Ms. Adams cannot succeed on her claim. She alleges only that Mr. Terry committed actions that she believed were in contravention of the Medicare Regulations and that she told him that it made her uncomfortable.[112] She was not terminated for exercising a statutory right, nor was she terminated for refusing to commit an illegal act. There is no set of facts that Ms. Adams can present that establish a retaliatory discharge claim.

[111] Ex. "1," Adams Depo., p. 135:4-15; Complaint for Damages, ¶ 17(g) [R. Doc. 1].

[112] Ex. "1," Adams Depo., p. 129:6-18.

## CONCLUSION

Ms. Adams may have honestly perceived Mr. Terry as acting rude and unprofessional toward her. However, even if Ms. Adams' allegations as to Mr. Terry's words and actions are true, Ms. Adams has failed to set forth a *prima facie* case for any of her claims. Further, even if she had established a prima facie case for disparate treatment on the basis of sex or age, Renaissance RX has set forth a legitimate, non-discriminatory reason for her termination. Finally, it is clear that Ms. Adams cannot establish a claim for retaliatory discharge under Indiana law as no statutory right is at issue nor was Ms. Adams terminated for refusing to commit an illegal act.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**

*/s/ Sarah K. Casey*
ERIN E. PELLETERI (LSBA #30666)
SARAH K. CASEY (LSBA #32385)
201 St. Charles Avenue, Suite 3600
New Orleans, LA 70170
Telephone: 504-566-5200
Fax: 504-636-4000

AND

**FROST BROWN TODD LLC**

JENAI M. BRACKETT (#30025-49)
201 N. Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN 46244-0961
Telephone: 317-237-3800
Fax: 317-237-3900

**ATTORNEYS FOR DEFENDANT, UTC LABORATORIES, L.L.C. d/b/a RENAISSANCE RX**

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December, 2016, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

Jason R. Delk, Esq.
Daniel J. Gibson, Esq.
Arie J. Lipinski, Esq.
COUNSEL FOR PLAINTIFF

and I hereby certify that I have served the following non-ECF participants via electronic mail: None.

*/s/ Sarah K. Casey*