UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MELANIE ADAMS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:15-cv-01401-JMS-TAB |
| | ) | |
| UTC LABORATORIES, LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

Plaintiff Melanie Adams worked at Defendant UTC Laboratories, LLC ("UTC") as a sales representative from January 2014 until her termination in October 2014. Ms. Adams claims that she was discriminated against because of her age (53) and gender, and experienced a hostile work environment, based on treatment from her supervisor, Doug Terry. Ms. Adams worked under Mr. Terry's supervision for approximately one month before her termination, which she characterizes as "abrupt" and which UTC claims was due to Ms. Adams' lack of necessary medical background and unwillingness to take the necessary steps to improve her performance. Ms. Adams asserts claims for age discrimination and harassment under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and sexual harassment and discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(b). UTC has moved for summary judgment on all of Ms. Adams' claims, [Filing No. 52], and the motion is ripe for the Court's decision.

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d

903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to the Plaintiff as the non-moving party, drawing all reasonable inferences in her favor. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).[1]

---

[1] The Court's Practices and Procedures clearly set forth in Appendix A how to cite to exhibits in a brief. [Filing No. 7.] The parties have not followed the Court's clear instruction, instead referring to exhibits by name or number, and citing to their actual page or paragraph numbers instead of their ECF page numbers. For example, UTC cited to material on page 8 of excerpts from Ms. Adams' deposition as "Ex. '1,' Adams Depo, p. 8:21-22." [*See* Filing No. 53 at 7.] Instead, the citation should be "Filing No. 52-4 at 2," which corresponds to the ECF number of the document, and the ECF page number where the cited testimony appears. Similarly, Ms. Adams has not followed the Court's Practices and Procedures, and refers to the exhibit name rather than the ECF number of the document. For example, Ms. Adams cites to material on pages 59-60 of excerpts from Mr. Terry's deposition as "Terry Dep. pp. 59-60." [Filing No. 63 at 3.] This citation should be "Filing No. 64-2 at 11-12," which denotes the ECF number of the document, and the ECF page numbers where the cited testimony appears. The parties' failure to provide the proper form of citation the Court specifically set forth in its Practices and Procedures made the Court's review of the pending motion unnecessarily cumbersome. Counsel are cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

- 3 -

### A. Initial Employment With UTC

Ms. Adams began working for UTC[2] on January 22, 2014, as an independent contractor. [Filing No. 64-1 at 4-5.] UTC administered a DNA testing program that allowed physicians to test a patient's genetic makeup to determine how those patients metabolized medications. [Filing No. 64-1 at 5.] Ms. Adams was responsible for informing physicians and nurses about the program and getting physicians' offices to participate in the program. [Filing No. 64-1 at 5.] Ms. Adams would typically visit between 30 and 50 physicians' offices per week. [Filing No. 64-1 at 10.] Ms. Adams initially worked under the supervision of Brian George and Sarj Patel. [Filing No. 64-1 at 5.] Ms. Adams claims that both Mr. George and Mr. Patel "raved" about her work ethic and success. [Filing No. 64-1 at 28-29.]

### B. Working Under the Supervision of Doug Terry

In July 2014, Ms. Adams became a W-2 employee at UTC and began serving as a Sales Team Territory Manager. [Filing No. 64-1 at 6-7; Filing No. 64-1 at 31.] She had the same duties and responsibility as she had when working as an independent contractor. [Filing No. 64-1 at 7.] Upon becoming a W-2 employee, Ms. Adams was not given any information regarding required outcomes or sales quotas for her position. [Filing No. 64-1 at 7-9.]

In September 2014, Doug Terry – Senior District Manager for UTC responsible for over-seeing Sales Representatives in North Carolina, Indiana, and Southern Illinois – became Ms. Adams' supervisor. [Filing No. 64-1 at 13; Filing No. 64-2 at 5-7.] Mr. Terry supervised two sales representatives in North Carolina, three sales representatives in Indiana, and two sales representatives in Illinois. [Filing No. 64-2 at 5-7.] In Indiana, Mr. Terry supervised Ms. Adams, Tony Dal

---

[2] The entity which employed Ms. Adams was Renaissance RX, [*see* Filing No. 1 at 1-3], but Ms. Adams voluntarily dismissed Renaissance RX because "it is not a separate entity from [UTC]," [Filing No. 20 at 1]. Accordingly, the Court refers to both Renaissance RX and UTC as "UTC."

Santo, and Michelle Miller. [Filing No. 64-2 at 13-14.] Mr. Terry did not speak with Ms. Adams' prior supervisors, look at her prior performance evaluations, or have any knowledge regarding the training she had received during her time at UTC. [Filing No. 64-2 at 11-12.]

Ms. Adams and Mr. Terry primarily communicated via email correspondence and text messages. [Filing No. 64-1 at 13.] The first time that they met in person was on September 18, 2014 at a restaurant in Indianapolis. [Filing No. 64-1 at 13.] During the meeting, Mr. Terry told Ms. Adams that she could buy a computer for herself for the field, but to remember not to save any of her naked pictures on the computer. [Filing No. 64-1 at 13.] Mr. Terry did not provide Ms. Adams with any information regarding sales quotas during that meeting. [Filing No. 64-2 at 15-16.] Mr. Terry, Ms. Adams, Ms. Miller, and Mr. Dal Santo met the following day, and Mr. Terry again mentioned that they could purchase computers, but that they should not save any naked pictures. [Filing No. 64-1 at 14.] Ms. Adams did not complain about either of these meetings until the day she was terminated. [Filing No. 52-4 at 15.]

On September 25, 2014, UTC provided Ms. Adams with a PowerPoint presentation relating to the product she was selling, and Ms. Adams felt that she knew the product well through self-teaching and with the assistance of her former supervisors. [Filing No. 64-1 at 12.] On October 13, 2014, Mr. Terry sent Ms. Adams an email that provided her with a sales quota in writing for the first time. [Filing No. 64-2 at 18; Filing No. 64-2 at 37.] The sales quota was similar for each of the three Indiana sales representatives, and Mr. Terry never discussed with Ms. Adams what the repercussions might be if she failed to meet the sales quota. [Filing No. 64-2 at 19-22.]

Ms. Adams and Mr. Terry met in person again at an Indianapolis restaurant on October 16, 2014 and during their meeting Mr. Terry screamed at Ms. Adams, belittled her, "kind of flung" the PowerPoint presentation at her, and said "show me that you have memorized this." [Filing No.

64-1 at 15.] When Ms. Adams responded that she had not memorized the PowerPoint presentation, Mr. Terry cursed at her and told her that she was "never going to become anything." [Filing No. 64-1 at 15.] Ms. Adams was frightened during the meeting, and left devastated and in tears. [Filing No. 64-1 at 15.] She did not report Mr. Terry's behavior, though, because he was her new boss and "if I went right away and started complaining about him, how did that look on me, you know, why couldn't I handle him, why couldn't I handle the situation. So I really was trying to give him the benefit of the doubt and trying to overcome a challenging situation." [Filing No. 64-1 at 15.] After this meeting, Mr. Terry expressed concern to Dr. Chris Graf, a UTC General Manager, regarding Ms. Adams' clinical knowledge. [Filing No. 64-2 at 21.]

On October 28, 2014, Ms. Adams picked Mr. Terry up from the Indianapolis International Airport and they drove together to Evansville. [Filing No. 64-1 at 15.] Ms. Adams had provided Mr. Terry with an agenda for his visit, and he told her that the agenda was "BS," and began "drilling" her on her product knowledge and harassing her. [Filing No. 64-1 at 15-16.] Mr. Terry's harassment reached a point where Ms. Adams told him it was interfering with her ability to drive safely. [Filing No. 64-1 at 16.] By the time they arrived at their first appointment at a physicians' office, Ms. Adams was shaking. [Filing No. 64-1 at 16.] During several of their visits to physicians' offices on October 28, 2014, Mr. Terry and Ms. Adams were not able to see the physicians and so Mr. Terry would leave a brochure and ask the receptionist or office manager to leave a sticky note on the brochure stating that UTC was involved with a clinical trial for Medicare and that there were incentives available for physicians. [Filing No. 64-1 at 16.] Mr. Terry informed Ms. Adams that having the receptionist or office manager write a sticky note was a way to avoid getting in trouble for mentioning clinical trials with Medicare or financial incentives. [Filing No. 64-1 at 16.] Ms. Adams informed Mr. Terry that she was uncomfortable with this practice, but

Mr. Terry told her that as long as they did not write the sticky notes themselves, they would not get caught. [Filing No. 64-1 at 16.] Ms. Adams believed that this conduct amounted to an illegal kickback, yet Mr. Terry continued to engage in this conduct throughout the day at different physicians' offices. [Filing No. 64-1 at 16-18.] Mr. Terry told Ms. Adams in a threatening manner that she would never be successful if she did not engage in this practice. [Filing No. 64-1 at 18.] When she told Mr. Terry that this was not the way she does business, he became irritated and upset. [Filing No. 64-1 at 19.]

Also on October 28, 2014, Mr. Terry told Ms. Adams to approach two younger females at a physicians' office in Clinton, Indiana and to ask for their business cards for him. [Filing No. 64-1 at 19.] When Ms. Adams asked Mr. Terry why he wanted the business cards, he stated "[b]ecause they are good looking, they are young, and maybe I could hire them." [Filing No. 64-1 at 19.] He also stated "[t]hat's what I miss about the pharmaceutical business so terribly, is all the good looking girls I used to be able to be around and interact with," and "I sure miss seeing those hot pharmaceutical reps." [Filing No. 64-1 at 19-20.]

On the evening of October 28, 2014, Ms. Adams and Mr. Terry went to dinner together. [Filing No. 64-1 at 20.] During dinner, Mr. Terry discussed the hiring of young sales representatives and how he loves young representatives because "they won't backtalk me, they won't tell me to be quiet…. I can yell at them…. I love this about these young people." [Filing No. 64-1 at 20.] Mr. Terry continued to reference both young, attractive female sales representatives and young male sales representatives, then asked a young, attractive waitress for her name and phone number in case she wanted to meet with him about some potential job openings. [Filing No. 64-1 at 20-21.] During the dinner, Mr. Terry was egotistical, demeaning toward Ms. Adams, angry, yelling, and belligerent. [Filing No. 64-1 at 20.]

The following morning, at their first meeting of the day at a physicians' office, Mr. Terry started yelling at Ms. Adams and said "[g]et up here and you start writing down exactly the answers to the questions I'm giving you." [Filing No. 64-1 at 21-22.] He then said "[i]f you don't have your S-H-I-T together, then when Dr. Graf comes in next week to work with you he's going to fire you….You're not doing everything I tell you to do." [Filing No. 64-1 at 22.] Mr. Terry continued to scream at Ms. Adams, and Ms. Adams began crying. [Filing No. 64-1 at 22.] After the meeting at the physicians' office, Ms. Adams and Mr. Terry went to a coffee shop where Mr. Terry continued to yell at Ms. Adams. [Filing No. 64-1 at 22.] Mr. Terry then asked Ms. Adams to take him to the Evansville Airport and said "[w]e're not going to spend any more time together." [Filing No. 64-1 at 22.]

The next day, on October 30, 2014, Mr. Terry informed Ms. Adams during a telephone conversation that she was being terminated because "it is not going to work out." [Filing No. 64-1 at 25-26.]

## C. Ms. Adams' Complaints About Mr. Terry

Prior to being terminated, Ms. Adams had voiced her concerns during telephone conversations with her former supervisor, Mr. George, that Mr. Terry was "a yeller and a screamer," was "hard to work for," and did not return her phone calls. [Filing No. 64-1 at 23-24.] She also voiced her concerns to Mr. George and Mr. Patel after she was terminated. [Filing No. 64-1 at 24.] On the day of her termination, Ms. Adams wrote and sent a lengthy letter to Kevin McAndrew, Vice President of Human Resources at UTC, describing Mr. Terry's behavior and stating "I am very disappointed and extremely upset about this experience. I am reaching out to you for assistance." [Filing No. 52-7.] She was distraught and upset while writing the letter, and "failed to put a few pieces in that letter." [Filing No. 64-1 at 24.]

**D.  Ms. Adams' Performance While Employed at UTC**

Before her termination, Ms. Adams had secured a large account that was expected to begin the DNA testing program by mid-November 2014.  [Filing No. 64-1 at 11.]  Additionally, Ms. Adams was performing well compared to her Indiana counterparts – for example, Mr. Dal Santo, who started working at UTC just a few months after Ms. Adams, obtained 18 DNA swabs[3] in September 2014, while Ms. Adams had obtained 24 DNA swabs in that same time period.  [Filing No. 64-2 at 23-24; Filing No. 52-20.]  Mr. Terry was not concerned about Mr. Dal Santo's performance because he had been with UTC for a shorter amount of time than Ms. Adams.  [Filing No. 64-2 at 23-24.]  Ms. Miller had not obtained any DNA swabs during the same time period.  [Filing No. 52-20.]  For September 2014, Ms. Adams was ranked 19th out of 54 sales representatives in terms of DNA swabs collected.  [Filing No. 52-20.]  As of September 19, 2014, she was graded as a "B" by UTC.  [Filing No. 64-2 at 38.]

In October 2014, Ms. Adams had obtained 26 DNA swabs, representing an 8% increase from her September numbers.  [Filing No. 52-20.]  Ms. Miller had still failed to obtain DNA swabs by that point.  [Filing No. 52-20.]  Neither Mr. Dal Santo nor Ms. Miller reached their sales quotas

---

[3] Sales representatives like Ms. Adams, Mr. Dal Santo, and Ms. Miller went to physicians' offices, explained the DNA testing program that UTC offered, and helped to get the offices set up for participation in the program if the physicians indicated interest.  [Filing No. 64-1 at 5.]  When physicians' offices indicated they wanted to participate in UTC's program, the sales representatives would collect DNA samples or "swabs" from patients at the physicians' office and send them out to be tested as part of the program.  [*See* Filing No. 64-1 at 6 (Ms. Adams testifying that "we did the swabs, sent them in, and then they had to be completed and then the testing results back to the physician…."). ]  UTC used the number of DNA tests a sales representative was responsible for facilitating as a measure of job success.  [Filing No. 64-2 at 37 (October 13, 2014 email message from Mr. Terry to Ms. Adams setting forth the number of DNA tests sales representatives were expected to complete for October, November, and December 2014).]

for October or November 2014.  [Filing No. 64-2 at 26.]  Ms. Adams was the only sales repre-

sentative under Mr. Terry's supervision that was terminated during Mr. Terry's employment with

UTC.  [Filing No. 64-2 at 30.]

**E.  EEOC Charge**

On June 5, 2015, the Equal Employment Opportunity Commission ("EEOC") issued a

Right to Sue Letter to Ms. Adams, which related to a Charge she had filed with the EEOC.  [Filing

No. 52-19.]

**F.  The Lawsuit**

Ms. Adams initiated this lawsuit on September 3, 2015.  [Filing No. 1.]  In her Complaint,

Ms. Adams alleges claims against UTC for age discrimination and harassment under the ADEA,

sexual discrimination and harassment under Title VII, retaliatory discharge in connection with the

Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2, and piercing the corporate veil.  [Filing

No. 1 at 7-15.][4]  In her Statement of Claims,[5] Ms. Adams describes her claims as follows:

1. Violation of ADEA – Shortly after Plaintiff's commencement of employment
   with [UTC], in early 2014, she was subjected to disparate treatment and harass-
   ment based upon her age because she was not the young attractive female that
   Douglas Terry, her supervisor, preferred for his sales representatives.  Mr. Terry
   frequently made comments about his preference for having young attractive fe-
   males as his sales representatives, and his constant expression of his preference
   for young attractive females created an unprofessional and hostile work envi-
   ronment for Plaintiff.  Mr. Terry belittled Plaintiff in public and screamed and
   cussed at her in front of potential customers in an effort to force her to resign

---

[4] Ms. Adams originally named Renaissance RX, TPG Growth, LLC, Dr. Tarun Jolly, Barry Grif-
fith, Patrick Ridgeway, and Mr. Terry as Defendants, but voluntarily dismissed them from the
lawsuit.  [Filing No. 12; Filing No. 20.]

[5] The Court amended its Uniform Case Management Plan for civil cases to include the requirement
that, at the conclusion of discovery, the party with the burden of proof file a Statement of Claims
which sets forth the claims it intends to prove at trial and the legal theories upon which the claims
are based.  This requirement encourages dismissal of claims that discovery perhaps has indicated
will not succeed, and clarifies for the parties and the Court which claims will proceed to trial.  The
Court relies on the Statement of Claims, as opposed to the Complaint, to set forth the legal claims
a plaintiff intends to prove at trial.

from Defendant. Plaintiff suffered adverse employment actions throughout the course of her employment with Defendant, including but not limited to disparate treatment and a hostile work environment, and her employment with Defendant was ultimately terminated without any valid or justifiable basis out of retaliation for her voicing opposition to Mr. Terry's fraudulent scheme to circumvent federal Medicare regulations. As a result of Defendant's age discrimination, harassing behavior and unlawful termination of Plaintiff's employment, Plaintiff has suffered substantial damages.

2. Violation of Title VII of the Civil Rights Act of 1964 – As a female, Plaintiff is a member of a protected class. She was qualified for her position with Defendant and satisfactorily performed her job duties and responsibilities throughout…the course of her employment. Defendant has engaged in unlawful employment practices, including but not limited to its pattern or practice of sex discrimination, in violation of Section 703(b) of Title VII, 42 U.S.C. § 2000e-2(b), by hiring and terminating employees based [on] their meeting certain sexual standards, which are young, attractive and female. Indeed, Plaintiff was subject to disparate treatment, a hostile work environment and was terminated by Defendant because she is not the young attractive female that Mr. Terry prefers for Defendant's sales representatives. Mr. Terry was Plaintiff's supervisor with the authority to effect significant change in her employment status, Defendant knew or should have known that Mr. Terry was engaging in these unlawful practices and, therefore, Defendant is liable for Mr. Terry's actions.

[Filing No. 49 at 1-2.]

### III.
#### DISCUSSION

UTC moves for summary judgment as to all of Ms. Adams' claims. [Filing No. 52.] The Court will address each claim in turn.

### A. Retaliatory Discharge in Connection With Indiana Anti-Kickback Statute

Ms. Adams originally alleged a retaliatory discharge claim under the Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2, but voluntarily dismissed that claim as against all Defendants. [Filing No. 20 ("the parties also stipulate that Plaintiff's claim under the Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2, Count III, be dismissed in its entirety as to all defendants without prejudice").] The Court is puzzled as to why both parties discussed that claim in connection with the Motion for Summary Judgment, as that claim has already been dismissed. [Filing

No. 23 at 1 ("IT IS ALSO ORDERED that Plaintiff's claim under the Indiana Anti-Kickback Statute, Ind. Code § 12-15-24-2, be dismissed in its entirety as to all defendants without prejudice").] Further, Ms. Adams did not include that claim in her Statement of Claims, which she filed after the Court dismissed that claim. [Filing No. 49 (discussing only ADEA and Title VII discrimination and harassment claims).] Accordingly, because the retaliatory discharge claim has already been dismissed, the Court **DENIES AS MOOT** UTC's Motion for Summary Judgment as to that claim.

### B. Piercing the Corporate Veil

Ms. Adams also alleged a claim for "piercing the corporate veil" in her Complaint, requesting that "the corporate veil of Defendants, Renaissance RX, [UTC], TPG Growth, LLC, Dr. Tarun Jolly, Barry Griffith and Patrick Ridgeway, should be pierced to provide that Defendants…are jointly and severally liable to Plaintiff for the damages recovered by Plaintiff." [Filing No. 1 at 14-15.] The parties, however, do not address that claim in their summary judgment briefs and Ms. Adams did not include it in her Statement of Claims, [Filing No. 49]. Because only one Defendant remained after Ms. Adams' voluntary dismissals, the "piercing the corporate veil" claim, which relates only to requesting joint and several liability for multiple Defendants, is no longer viable. To the extent the parties had not already considered this claim resolved, the Court **DISMISSES** Ms. Adams' "piercing the corporate veil" claim.

### C. Sex Discrimination and Harassment Claims Under Title VII

In support of its Motion for Summary Judgment, UTC argues that Ms. Adams' sex discrimination and harassment claims fail as a matter of law. [Filing No. 53 at 17-28.] In her response brief, Ms. Adams only discusses her discrimination and harassment claims under the ADEA (and her already-dismissed retaliatory discharge claim under the Indiana Anti-Kickback Statute), but

does not address her discrimination and harassment claims under Title VII at all. [*See* Filing No. 63 at 11-22.] The Court finds that Ms. Adams has abandoned her discrimination and harassment claims under Title VII because she failed to respond to UTC's arguments in support of its Motion for Summary Judgment on those claims. *See Palmer v. Marion County*, 327 F.3d 558, 597-98 (7th Cir. 2003) ("because [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned"). UTC's Motion for Summary Judgment as to Ms. Adam's sex discrimination and harassment claims under Title VII is **GRANTED**.

### D. Age Discrimination and Harassment Claims under the ADEA

#### 1. Discrimination Claim

UTC argues in support of its Motion for Summary Judgment that Ms. Adams' discrimination claim under the ADEA fails as a matter of law because she has not presented any direct evidence of age discrimination, and any circumstantial evidence she presents does not show that age had anything to do with her termination. [Filing No. 53 at 17-18.] UTC also asserts that Ms. Adams has not set forth a prima facie case of age discrimination because she was not meeting UTC's legitimate employment expectations, she has not shown that similarly situated younger employees were treated more favorably than she was, and she has not shown that UTC's reasons for terminating her were pretextual. [Filing No. 53 at 19-22.]

In response, Ms. Adams contends that she has established a prima facie case of age discrimination because a question of fact exists regarding whether she was meeting UTC's legitimate employment expectations, and similarly situated employees including Ms. Miller and Mr. Dal Santo were treated more favorably than her because they were performing at the same or a lower level and were not terminated. [Filing No. 63 at 15-17.] Ms. Adams argues that there is a genuine

issue of fact regarding whether UTC's proffered reason for terminating her – poor work performance – was a pretext for age discrimination. [Filing No. 63 at 17-19.] Finally, Ms. Adams asserts that "[t]he designated record is filled with evidence of [Mr.] Terry's discriminatory intent that creates a reasonable inference of intentional discrimination." [Filing No. 63 at 19.]

UTC reiterates its arguments on reply. [Filing No. 65 at 4-12.]

The ADEA makes it unlawful for an employer to take an adverse employment action against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1); *see also Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014). The ADEA's protections extend to individuals who are 40 years of age and older. 29 U.S.C. § 631(a). A plaintiff can prove ADEA claims under either the direct or indirect method of proof. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014). The Seventh Circuit recently instructed that, under the direct method, courts should consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[6]

---

[6] *Ortiz* disapproved of prior efforts on the part of district courts to "shoehorn all evidence into two 'methods,' and [their] insistence that either method be implemented by looking for a 'convincing mosaic,'" because that approach "detracted attention from the sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would have kept his job if he [was not a member of a protected class] and everything else had remained the same…." This Court reads *Ortiz* as a shift from treating "direct" and "indirect" evidence differently, and not as creating a standard different from the two-option test whereby a plaintiff can either prove discrimination by the "direct

- 14 -

Under the indirect method, a plaintiff can rely on the *McDonnell Douglas* burden-shifting method of proof. *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of age discrimination, a plaintiff must show that: "(1) [s]he was over forty years of age; (2) [s]he was meeting [her] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Franzoni v. Hartmax Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002). A plaintiff need not show that she was meeting her employer's expectations "when [she] alleges that other employees were also not meeting the employer's expectations but the employer selectively punished the plaintiff, or punished the plaintiff more severely, for discriminatory reasons." *McNair v. Bonaventura*, 46 Fed. Appx. 849, 852 (7th Cir. 2002).

If the plaintiff meets that burden, then the employer must "set forth a legitimate nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. Southern Illinois University – Edwardsville*, 510 F.3d 772, 783 (7th Cir. 2007) (citation and quotation omitted). If the employer satisfies its burden, the burden shifts back to the plaintiff who must then prove that the proffered reason was pretextual. *Walker v. Glickman*, 241 F.3d 884,

---

method," or the "indirect burden-shifting method" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766 ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole"); *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas*….' As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

889 (7th Cir. 2001) (citation omitted). Pretext is defined as "a dishonest explanation, a lie rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)). To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003). An employer's changed reasoning or failure to proffer an explanation when given an opportunity to do so can be evidence of pretext. *Id.*

The Court will analyze this case as it has other employment discrimination cases, keeping in mind the Seventh Circuit's admonition in *Ortiz* to consider all evidence as a whole, rather than categorizing evidence by type.

### a. Indirect Method

Ms. Adams first argues that her ADEA discrimination claim succeeds under the indirect method because genuine issues of fact exist regarding whether she was meeting UTC's legitimate job expectations, whether she has presented similarly situated employees who were treated more favorably, and whether UTC's reasons for terminating her were pretextual. [Filing No. 63 at 12-19.] The Court agrees that summary judgment is not appropriate on her ADEA discrimination claim.

First, as to whether Ms. Adams was meeting UTC's legitimate employment expectations, the parties present differing versions of the story. UTC argues that Ms. Adams admitted her sales numbers were "sub-par," that she ranked in the bottom half of sales representatives for the month of October, that every sales representative supervised by Mr. Terry ranked above her except for Ms. Miller, who had only been with UTC for a month at that time, and that when Ms. Adams was terminated "two of [her] three accounts were winding down, with no indication that she would be

able to replace them with new accounts." [Filing No. 53 at 19.] UTC also claims that Ms. Adams lacked clinical knowledge. [Filing No. 53 at 20.] Ms. Adams, however, argues that she only admitted her sales numbers were lower than some sales representatives, and cites to sales records indicating that she obtained 24 DNA swabs in September 2014 – the 19th highest number out of 54 sales representatives – and that twenty sales representatives did not obtain any DNA swabs at all. [Filing No. 63 at 13 (citing Filing No. 52-20 at 1).] She also points to sales records reflecting that in October 2014 she was ranked 28th out of 54 sales representatives in terms of number of DNA swabs collected. [Filing No. 63 at 13.] Ms. Adams also testified that prior to being terminated, she had secured a large account that was expected to begin the DNA testing program by mid-November 2014. [Filing No. 63 at 8 (citing Filing No. 64-1 at 11).] As to her clinical knowledge, Ms. Adams testified that she understood the product, and had received training from her previous managers when she was an independent contractor. [*See, e.g.*, Filing No. 64-1 at 9.] The Court finds that this evidence could lead a reasonable jury to conclude that Ms. Adams was meeting UTC's legitimate employment expectations when she was terminated.[7]

Second, the Court considers whether Ms. Adams has shown that similarly situated, substantially younger employees were treated more favorably. Ms. Adams relies on Ms. Miller and Mr. Dal Santo as comparators, because "both [were] sales representatives for [UTC] with the same exact job duties and the same exact sales territory as [her]." [Filing No. 63 at 15.] Ms. Miller was 45 at the time of Ms. Adams' termination, and Mr. Dal Santo was 38. [Filing No. 52-5 at 2.] To present a similarly situated comparator, Ms. Adams must show that the individual was outside of

---

[7] The Court is puzzled by UTC's argument that Ms. Adams cannot rely on sales data from September 2014 because "past performance is irrelevant." [Filing No. 65 at 6.] UTC itself argues that it terminated Ms. Adams in part due to poor sales performance, and Ms. Adams was terminated on October 30, 2014. Therefore, sales data from September 2014 is directly relevant to the issue of whether Ms. Adams was meeting UTC's legitimate employment expectations.

the protected class and was "comparable to the plaintiff in all material respects." *Crawford v. Ind. Harbor Belt R. Co.*, 461 F.3d 844, 846-47 (7th Cir. 2006) (emphasis omitted); *see also David*, 846 F.3d at 225. Because Ms. Miller is within the class protected by the ADEA (since she was over 40 years old when Ms. Adams was terminated), she is not a sufficient comparator to support Ms. Adams' claim. Mr. Dal Santo, however, is outside of the protected class because he was under 40 years of age when Ms. Adams was terminated. UTC argues that he is not similarly situated to Ms. Adams because he did not have "similar performance issues regarding clinical knowledge," he had been working for UTC for less time than Ms. Adams, and he had a medical sales background while Ms. Adams did not. [Filing No. 65 at 8-9.] A similarly situated employee "need not be identical in every conceivable way," and the Court takes a "flexible, common-sense" approach to the analysis. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and quotation omitted). The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). Ms. Adams has presented enough evidence for a reasonable jury to conclude that she and Mr. Dal Santo are similarly situated for purposes of establishing a prima facie case of discrimination under the ADEA. They held the same job, covered the same sales territory, and had the same supervisor. Mr. Dal Santo's sales numbers were also below goal. [Filing No. 64-2 at 26.] Additionally, while UTC argues that Ms. Adams testified she did not know how other employees were treated, [*see* Filing No. 65 at 8], it is undisputed that Mr. Dal Santo was not terminated and Ms. Adams was. Ms. Adams has presented a similarly situated comparator, outside of the protected class, who was treated more favorably than she was.

Finally, the Court considers the issue of pretext. UTC argues it has set forth a legitimate, non-discriminatory reason for terminating Ms. Adams – poor job performance – and that Ms. Adams has not shown that reason was pretextual. [*See* Filing No. 65 at 9-11.] The Court has already concluded that a genuine issue of fact exists regarding whether Ms. Adams was meeting UTC's legitimate job expectations. Because a reasonable jury could conclude that Ms. Adams was performing her job satisfactorily, it follows that a reasonable jury could conclude that UTC's stated reason for terminating her – poor job performance – was pretextual. This is particularly true given the acrimonious nature of the relationship between Ms. Adams and Mr. Terry, the fact that Mr. Terry provided Ms. Adams with sales quotas in writing for the first time just two weeks before her termination, the fact that sales records indicate Ms. Adams was not at the low end of sales representatives in terms of performance, and the fact that Mr. Dal Santo's performance was below Ms. Adams' but he was not terminated.

Ms. Adams has sustained her burden under the indirect method of proof, and has demonstrated that genuine issues of material fact exist such that a reasonable jury could conclude that Ms. Adams was meeting UTC's legitimate job expectations, that Mr. Dal Santo is a similarly situated comparator, and that UTC's stated reason for terminating Ms. Adams was pretextual. Conversely, a reasonable jury could conclude that UTC fired Ms. Adams for poor job performance, and nothing more. Accordingly, the Court **DENIES** UTC's Motion for Summary Judgment on Ms. Adams' ADEA discrimination claim.[8]

---

[8] Since the Court has concluded that Ms. Adams has sustained her burden under the indirect method of proof, it need not and will not consider the issue of whether Ms. Adams' claim succeeds under the direct method of proof. At trial, the burden-shifting methods no longer apply. *See, e.g.*, *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994) (stating that an "attractive formulation" of a jury instruction on an ADEA discrimination claim is 'You must decide whether the employer would have fired…the employee if the employee had been younger than 40 and everything else had remained the same'").

##### 2. *Harassment Claim*

In support of its Motion for Summary Judgment, UTC argues that there is no evidence that Mr. Terry treated younger sales representatives better than Ms. Adams, and that Ms. Adams never complained about harassment based on her age until after she was terminated. [Filing No. 53 at 28-29.]

Ms. Adams responds that there is a question of fact regarding whether she was subjected to a hostile work environment, arguing that "[w]hether he was berating [Ms.] Adams in public, embarrassingly perseverating on his preference for working with young, good-looking females, hitting on young females or repeatedly expressing a desire to work with young, submissive employees, [Mr.] Terry repeatedly subjected [Ms.] Adams to a harassing work environment that was undoubtedly threatening and humiliating." [Filing No. 63 at 21.]

In its reply brief, UTC argues that Ms. Adams and Mr. Terry met a total of four times over a one-and-a-half-month period, they communicated mainly through phone, text, and email, Mr. Terry did not say anything objectionable in those communications, and Mr. Terry did not make any age-based comments during the first three in-person encounters they had. [Filing No. 65 at 13.] UTC also argues that Ms. Adams' allegations that Mr. Terry berated her all relate to him questioning her clinical knowledge and not to her age. [Filing No. 65 at 13.] It notes that Ms. Adams provides other possible reasons for Mr. Terry's behavior, including caffeine consumption, unprofessionalism, and a potential bipolar disorder. [Filing No. 65 at 13-14.] UTC again asserts that Ms. Adams never complained about Mr. Terry's "preference for working with young beautiful women…." [Filing No. 65 at 14.]

Harassment/hostile work environment claims under the ADEA are analyzed the same way as harassment/hostile work environment claims brought under Title VII.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (noting that the Seventh Circuit Court of Appeals "has assumed, without deciding, that plaintiffs may bring hostile environment claims under the ADEA," and applying the same standard used to analyze hostile work environment claims brought under Title VII).  An actionable hostile work environment claim requires the plaintiff to prove: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability."  *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005).  Conduct cannot aid in creating a hostile work environment unless it is related to the protected characteristic.  *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).  The factors the Court may consider "in deciding whether the environment is hostile include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citation and quotation marks omitted).  "[T]he workplace that is actionable is the one that is hellish."  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (citations and quotation marks omitted)

The evidence, even when viewed in the light most favorable to Ms. Adams, is not adequate to support a hostile work environment claim under the ADEA.  The statements made by Mr. Terry or actions taken by him that Ms. Adams has presented that could support her harassment/hostile work environment claim based on her age are the following:

- On October 28, 2014, Mr. Terry forced Ms. Adams to approach two younger females at a physicians' office in Clinton, Indiana and ask for their business

cards to bring to him. He "was adamant that [Ms.] Adams needed to get those cards because they 'are good looking, they are young and maybe [Mr. Terry] could hire them.'" [Filing No. 63 at 6 (quoting Filing No. 64-1 at 19)];

- During the evening of October 28, 2014, as Mr. Terry and Ms. Adams were walking into a restaurant, Mr. Terry discussed the hiring of young sales representatives and how "he loves young representatives because 'they won't backtalk me, they won't tell me to be quiet…. I can yell at them…. I love this about young people.'" At the restaurant, Mr. Terry continued to talk about young attractive females and young male representatives, and "asked the young, attractive waitress for her name and phone number in case she wanted to meet with him about some potential job openings." [Filing No. 63 at 6 (quoting Filing No. 64-1 at 20).]

These two incidents, which occurred on the same day, simply are not enough to support a hostile work environment claim. While Ms. Adams complains about other actions taken by Mr. Terry – making comments about saving naked pictures on a computer, "drilling" her on product knowledge, repeatedly yelling at her, and berating her in public – she does not allege that these actions relate to her age and these actions cannot support a hostile work environment claim under the ADEA.

In short, the evidence Ms. Adams has presented related to a hostile work environment based on her age do not support the notion that her workplace was "hellish." Indeed, the actions all took place on the same day, and Ms. Adams did not complain about Mr. Terry's behavior until her termination – and, even then, did not mention the age-related comments from October 28 or mention age at all. [*See* Filing No. 52-7 at 2-4 (Ms. Adams' letter to Mr. McAndrew, which focuses on Mr. Terry's harassing behavior relating to her clinical knowledge, and does not mention harassment based on age at all).] Mr. Terry's age-related comments are not the type that are actionable under the ADEA through a hostile work environment claim. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (plaintiff must present evidence that conduct at issue was severe and pervasive enough to cause psychological injury); *McKenzie v. Illinois DOT*, 92 F.3d 473, 480

(7th Cir. 1996) ("isolated and innocuous incidents will not support a hostile environment claim"). While Mr. Terry may have acted in an unprofessional, disrespectful, and rude manner, the law simply does not guarantee a happy workplace. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). UTC's Motion for Summary Judgment as to Ms. Adams' ADEA harassment claims is **GRANTED**.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** UTC's Motion for Summary Judgment, [Filing No. 52]. Specifically, the Court:

- **DENIES AS MOOT** UTC's Motion for Summary Judgment as to Ms. Adams' retaliatory discharge claim under the Indiana Anti-Kickback Statute;

- **GRANTS** UTC's Motion for Summary Judgment as to Ms. Adams' sex discrimination and harassment claims under Title VII and her harassment claim under the ADEA; and

- **DENIES** UTC's Motion for Summary Judgment as to Ms. Adams' discrimination claim under the ADEA.

No partial final judgment shall issue.

Therefore, the only claim that remains in this litigation is Ms. Adams' claim for discrimination under the ADEA. The Court requests that the Magistrate Judge confer with the parties to address the possibility of an agreed resolution, or to establish a schedule for the upcoming July 10, 2017 trial.

Date: April 19, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

- 23 -